Yes, the first matter is U.S. v. Richard, a.k.a. Buzzy Dressel. Mr. Romano, I have to tell you, Mr. Romano, I can't imagine a better nickname for a union leader than Buzzy. May it please the court, John Romano for the United States. I'd like to reserve three minutes for rebuttal. Less than two years ago, this court unanimously reiterated that a review in court is to uphold the jury verdict, not to assert the right of the jury. We all know the law and the fact of the case. Your opponent argues that what you set forth in the brief as the grounds for the Rule 29 being improperly granted is based upon conjecture and conclusion. And in your brief, I think it starts at page 24, and you laid forth a long list of things that you say, evidence that you say would support the jury's verdict. Can you tell us, one, summarize for us what the evidence is? Tell us who the witness was who produced that evidence. And if you're able to, where in the record would you find it? And if you want to do a Rule 28 letter, 28-J letter, tell us back in the chapter and verse of the record. But it's important that we know what evidence is in the record to support what you say would support the jury's verdict. I think that counts one and two. Sure, Your Honor. Why don't we start with Joan Farkas' testimony, and that's in the reply brief. I would point you, I guess, to the four lowercase letter headings in my reply brief. And those four lowercase letter headings have evidence that the defendant ignored in his brief, in which, quite frankly, if the jury bought, and they were entitled to, and this Court has to credit that, were enough for conviction. And Joan Farkas, who was the office manager of the local, testified that she didn't provide, that the Libanadi did not provide any service for the local in 2008. And if the jury bought that, then they could find that this salary was for doing nothing. Now, would she be in a position to know of services that, your argument obviously makes sense, but would she be in a position to know of the services that Libanadi did provide, especially since she was not only providing the free lunches for the apprenticeship programs, but she was doing things outside of that capacity for the union as well? How would that witness know of those things? Well, she was the office manager for the union. I mean, she knew what she did, and she testified that she was hired, basically, to provide the lunch program. Now, on the lunch program... She was hired by the fund, right, for the lunch program? She claimed that Dressel hired her to do the lunches. She would be over at the JATF doing lunches. And she said she provided no service for the local in 2008. Now, on the JATF side, the evidence of intent, and that's, I think, really the fighting issue here,  Quite frankly, there's a lot of evidence of intent. Number one, the evidence was that multiple people testified that the lunch program was unnecessary. It was kind of trumped up, came out of nowhere. You know, the fact that it was for drinking at lunch, multiple witnesses said, no, that wasn't the case. There wasn't any drinking at lunch. There was not a problem. And we have one test, you know, Malazzo... What about the targetless issue? Excuse me? Targetless. What about that issue? That doesn't seem to have been the driving force for the program. And we have multiple witnesses, and I'll point them to you. Malazzo, page 147. Solider, page 409. Parchment, page 567. And Battaraco, page 712. Each of them said, look, he said this was about drinking. We don't want these kids going out and drinking during lunch. And multiple witnesses, including Malazzo and Solider, said that was not a problem. And Malazzo said, flat out, it wasn't necessary. The jury couldn't agree with that. It wasn't a problem. Drinking was not a problem. But the juzzle thought it was a problem, and there was evidence from which a juror could conclude that, one, he did think it was a problem, even though he was wrong in mistaking that belief. And he introduced this program to deal with a problem that did not exist, but he thought it existed. Wouldn't that negate the project's intent? No, Your Honor. Why wouldn't it? Well, first of all, there's no evidence that he thought it existed. I mean, there's nothing in the record. The trustees who would have known the best and the faculty members who would have known the best said it did not exist. Secondly, and I want to make this key point here, the embezzlement here is the fact that she was put on the union's salary, so she got this extra money. If they had simply instituted that program. That's where I was going to follow up on the chief's question, is if the program was really needed but they had just adhered to the $8 per pupil per day, you don't have a case, do you? I mean, technically there might have. I mean, it depends. I mean, it's possible, but we wouldn't have brought the case. We didn't bring that case, and we wouldn't have. I mean, I don't think it would have. The lunches were provided? The lunches were provided, and, you know, if they had simply said, okay, we're going to charge $8 a day, that's it. You know, maybe there would have been a difference of opinion as to whether it was necessary or not, but that wasn't what was charged. What was charged was, look, you said $8 a day, and I mean there were multiple witnesses. I have a list of maybe five, six witnesses who said $8. That meant the total cost, labor, material, everything. That's what I thought. When he said $8, that was the total cost. The batter then goes before the union. It says the same thing, $8. Now, why would anyone care what the food costs were at $8? I mean, that's the whole cost. Everyone thought that was the total cost. The embezzlement is placing her on the salary at $1,000 a week plus benefits, so basically a $1,500 a week job to provide what she was already being paid by the JATF, $8 a day. That's the embezzlement. And what we have is, going back to your first question. That covered the expenses, though, did it not? That's his theory. But, again, the trustees all said that was the total cost, and multiple witnesses said she was paid for all of these things she did. And, I mean, the claim that it only covered the costs, again, that's his theory of the case, and the jury was entitled to disregard that. And I would point to a couple of different areas where that shows that that doesn't make any sense. Number one, the testimony that the trustees were given. This is $8 total. The testimony that the union was given. This is $8. Why would they tell them that if they weren't trying to mislead them about, you know, Is there anywhere in the record that it was $8 profit per pupil and she was to be reimbursed her costs? No. That was going to be the total cost, salary and labor. The second thing I would point to, Your Honor, is, again, this testimony and evidence in the record that she received money for these other things she did. The LM2 forms show that she received money. You know, other people testified, look, she was getting paid for this. Again, she claims it's just costs. But, again, the jury was free to find, you know, whichever way they wanted. Third, if she was really the union's in-house caterer, and that's what she claims, then how come after the reimbursement in 2009, the union didn't pay a dime of her salary for this in-house union catering? 2009, 2010, 2011, 2012. They pay solely her job as building manager. They don't give her a dime for in-house union catering. So this didn't make any sense. Fourth, what is the evidence of this? The receipts? I mean, the jury was free to disregard those receipts out of hand. There was no evidence on them. There was no dates. There was no methods of payment. You're suggesting he was obligated to prove his innocence, are you, when you say what is the evidence of that? No, of course not. But that's really all he had to show for it. The jury could have looked at these and said, well, these receipts don't show us anything, quite frankly. I mean, Libinati testified, oh, well, no one ever complained about my receipts. That was just not true. McManus testified that they repeatedly complained about these receipts, and the jury was free to look at them and say, this doesn't show us anything. I mean, this is just kind of a post hoc rationalization that she was the union's in-house caterer. It just didn't make any sense. The union would have been paying her for the following years if she was the union's in-house caterer. She just wasn't. She was basically double dipping. She was given $8 a day to do the lunch program. She was getting paid to do these other programs that she did. It wasn't very many things. It was dinner here and there. And then she was getting this very large salary for doing nothing. And maybe I missed it, and maybe I didn't. There's no spillover argument here. In other words, that evidence that was introduced on the accounts that were acquitted was improperly introduced and spilled over to bias him in the accounts that we're talking about. That's not before us. Not that I'm aware of. This is purely a sufficiency question. You cite the Durden case. Isn't that a different factual situation from what you're coming here? Your Honor, quite frankly, we weren't able to find any cases that were exactly on point where someone hired someone to do one thing, but it's a double dipping case. And I think on page 1 or 2 of his brief, he admits, if this is double dipping, it falls under this statute. So there's multiple cases that have to do with double dipping. That was a clear double dipping case, the Durden case. Well, it's for the jury to decide. Look, he had a theory. The jury could have bought it. They didn't. I mean, we don't have to disprove all of his theories. The jury was entitled to credit our witnesses and find that, yes, this was double dipping. She got paid here, she got paid there for the same exact thing. And I would say what the genius of this scheme is, and I can go back to that, is Well, there were two geniuses who convicted him. Well, it took a while. He was able to basically lie to the JATF, get them to approve his program, and then on the union side put her on the salary, which he basically did with no oversight whatsoever. And as Bumble testified, and he's the current business manager, the Bowder and Dressel, because of their positions, would have been the only two people to really know what was going on on the other side of the house. And if you look at the testimony, and I'll cite a couple of pages for it, people on the JATF side were constantly asked, well, what about the salary she got on the union side? And they had no idea. They didn't know what salary she was getting. And people on the union side were asked, well, wasn't she being paid from the JATF? And they said, we don't know. We have no idea what was happening on the other side. So it really was ingenious in the sense that he broke it up, got it approved on this side, and nobody knew. Nobody was any the better. What about the letter from counsel? How at all does that play into this? I don't think it plays in at all. First of all, it's basically a, you know, quote, unquote, ratification two years after the money was taken. And secondly, I think the whole matter was – Two years? I thought it was three weeks. The letter from counsel? Are we talking about – the money was embezzled starting in 2008. In 2010, they get a letter from, you know – The JATF voted to approve the $108,000 payment as long as they got authorization from counsel, and that came three weeks later, right? Yes. They voted to reimburse if they got the approval. And, of course, the money was taken before the letter came in, and it was taken before they even approved it, which I think all goes to intent as well. And the point I'm trying to make, though, is that that money was taken from the union two years earlier. And so basically what has happened is they've reimbursed the union by taking money from the JATF. That's not a defense either. And this court in the lead has said that. You can't – you know, reimbursing money that you've embezzled is not a defense. So, I mean, I think there's just plenty of evidence of intent here, and the jury was entitled to credit that. And the district court, quite frankly, just ignored it all. I mean, if I went through the district court's opinion of how much evidence he ignored, it was a lot.  And then speculated about the not guilty part. So all of that is improper. Does the court have any more? Thank you very much. Did you save time? Three minutes. Mr. Smith. May it please the Court. Jeff Smith, Dakotas, Fitzpatrick & Colfer, Appalee defendant, Richard Dressel. What the government contends is not what happened. When Judge Sirica asked about Dernan, he highlighted the difference in this case from cases where appropriate proof has been provided of fraudulent intent under Section 501C. Dernan, as the court observed, was a clear double-dipping case. What the government cannot do is ask the jury to speculate based on labels, based on assertions, without grounded substantial evidence in the record. Ultimately, although we recognize this is an unusual posture and we have a substantial burden when we're talking about insufficiency on a jury verdict, the government still has the burden to produce substantial evidence of guilt beyond a reasonable doubt. And in this case, there's no dispute. The judge agreed. We agreed. The government agrees. Well, the problem is the jury disagreed. The jury disagreed. She's a judge. Starting at page 34, actually it's 24, of the government's brief, they list, they list a series of eight paragraphs, evidence that they say would have been sufficient to defeat a Rule 29 motion. As you know, the Rule 29 vote is very high in our language, and Oliva would make it very clear that it's the totality of the evidence, the totality of the circumstances that a jury can consider in determining whether or not there's fraudulent intent. Looking at his summary, those eight items that he says get you the fraudulent intent, where is he wrong? I asked him, you said in your brief that that's all speculation and conclusion, and I just asked him about it and he seemed to come forth not with chapter or verse but with evidence, witnesses, that substantiate these paragraphs. Why isn't there enough for a jury, even though any judge in this court may have disagreed and brought back an acquittal on these two accounts, why isn't there enough here to say that no reasonable juror could have possibly done what this judge did? There's no evidence. Because they recite chapter and verse but they don't ground it in the evidence, Judge, and we invite and we commend again to the court that it take a very searching look at the record, and I'll give you an example. The linchpin of the argument, the response just now, and the leading argument on page 34 is essentially another variant of the double dipping theory. Put differently on page 11 of the government's brief, they put it quite starkly. Libinati was separately paid for the lunch program and her other catering services and Libinati's salary was therefore a duplicative and inflated payment for the same services. The government opened on that theme. They told the jury that they were going to prove that Libinati was paid twice, that she double dipped, and that's the Durnin case. And we would concede that we would have a much greater uphill battle if there were evidence of that. What I commend to the court is on page 18 of the government's reply brief, the government lists their sites for their contention that it was disputed that Libinati was not in fact reimbursed only for expenses, but that she in fact received compensation from that expense advance reimbursement process. They essentially claim that she made profit from that expense reimbursement process. If you look, there is a string of 14 sites. Well, they didn't have to prove that up, though, to get a conviction. Well, Your Honor, they didn't have to prove it. Double dipping is one of their many failures. They lost on either of their 10 counts. And, Judge Hartman, we don't disagree that both for us and for the government, no one factor either demands acquittal or governs and demands conviction. It's a totality test. Libinati made that very clear. The Welch in the Eighth Circuit said that even proof of a lack of benefit is not sufficient to convict on one side, and in other cases, the courts have found that proof of authorization is not sufficient for an acquittal. Proof of benefit is not sufficient, and we embrace that standard. We're not saying that that's not the standard. What we're saying is under the totality test here, benefit, disclosure, authorization, whether genuine services were provided. But the government is contesting the benefit strongly. Can you address that? Yes, I will, Judge. Judge Sirica, one of the ironies of the government's necessity argument is that Mr. Malazzo, who was probably their principal witness there, the assistant training director, who expressed his opinion that this was not a necessary program, and as Judge McKee observed there were other reasons offered for that, himself said that the program did, in fact, benefit the school day. He acknowledged that it reduced tardiness, that it shortened the lunch hour, that it may have improved focus, and contrary to the government's contention, and we're not asking the court to weigh, he recalled numerous instances in which drinking had been a problem. His own apprentice class, he testified, had gone out drinking. He said, I didn't drink with them, but I recall that was an issue. He recalled an incident where a later group of apprentices, after he became assistant training director, came back from Hooters and went to Mr. Debouter, the training director's office, and presented him with some kind of T-shirt. Necessity is different than benefit. It is. Following up on Judge Siric, I think everyone agrees, and I think counsel on the other side basically conceded, that if the benefit were that the apprentices were fed by Ms. Libinati, and the detriment were that the training fund paid $8 per pupil, we're not here. What service did Ms. Libinati provide the union in 2008? Not to the training fund, to the union. Okay. And I was slow to answer Judge Siric's comment or question, so let me complete that and lead into the answer for your question, Judge Hardiman. Every witness the government called testified to benefit from the program. That's the short answer. Every single witness. Those who disagreed with the merits of the program, I would have done it differently. Not surprising in a 3,000-member, rambunctious political union, you're never going to get consensus, but every single witness acknowledged that there were benefits to the program. Now we come to the union. What did she do for the union in 2008, not the fund? What she did was the following. And Ms. Farkas, who was the witness they rely on to say that she did nothing for us in 2008, in fact, the testimony was she was not on my staff in 2008. What page in the transcript is that? I may have to provide that under Rule 28, Judge, I don't know if that's right. That is in the transcript, but there's also page 748, and your brief doesn't deal with that. Here's what she says there. She has asked, whether she was asked in the grand jury, whether Libidotti performed any service for the local in 2008, and her answer was no. And then the prosecutor asked, was that an accurate answer? And she says in 2008, yes. So how do you get around that? You've got a witness that was borderline hostile to government. I know she wasn't treated as an adverse witness, but in reading the transcript, she well could have been. And that witness testifies that Ms. Libidotti provided no service in 2008, which would seem to play directly into their theory that she did not earn any of that $46,000 salary. But what we know when we look at the fullness of the record is that she testified further when allowed to explain that she first called Ms. Libidotti the in-house union caterer. She explained the other union functions, not training center lunch program functions, but union functions that Ms. Libidotti handled in 2008. Those included their holiday parties, their annuity dinners, their retiree lunches, the Hackensack University Hospital Children's Program outreach effort, which Ms. Libidotti ran and was responsible for. It also ties into the evidence, and it goes back to the central theme in the government's case, as to whether she double-dipped or whether she didn't. If she were paid a salary by the union and was getting income from the lunch program, we would have a different case. What if she provided a benefit, but the jury concluded in the evidence of support, that the service or benefits she provided was unnecessary? If that is factored in with the financial condition of the union, under our holding it illegal, why wouldn't that be enough to get your fraudulent return? Because if there's testimony under the totality, we always have to come back to the standard in this case under this statute and its totality. It is both a challenge for the government and it's a challenge for the defense because it asks us not to look at one factor. Necessity is a matter of disagreement among factions within the union. But when we have evidence of benefit, when we have evidence of genuine services, there's no question that she provided the lunches, as the court said. You can't fake that. She showed up every day. She worked a hard, long day. She provided lunches to anywhere from 25 to 45 apprentices. What if the board of trustees thinks it's of benefit to the union to have the spouse of the business manager travel with the business manager? So could that never be a conviction? No, as long as they vote and they say, well, you know, we think the business manager has to travel a lot. It's a tough job. We're going to pay for the spouse to travel with the girlfriend to travel with the manager. We'll keep them out of orders at lunchtime. It wouldn't do that. I wouldn't say it would ever be. One of the struggles that we all have with this is there's no simple template. There's no check the box and you're either acquitted or you're not guilty. The case law actually casts light on that. There are a couple of cases. Mirolda is a question, was a case, I think it's a Ninth Circuit case, where the president bought gas for his wife. And despite evidence that first level seems inappropriate, the court found there wasn't sufficient evidence of fraudulent intent, that there may have been a good faith belief under those facts and under those circumstances that that was an appropriate expenditure of union funds. Our position here is that under the totality test when you have conceded benefit, and this I think gets a little bit lost in the brief, when you have the JATF, the Joint Apprentice Training Fund, trustees voting in 2010 based upon counsel's letter to reaffirm this program, when they're two years in, they have a chance to take a second look. This is not a Dressel-driven dynamic. This is the trustees who are controlled by a chairman who's a management trustee. This is not authorization when a corrupt union official authorizes his or her own actions. This is an independent board that voted, was presented with the cost of the program, was presented with the $8 issue, the salary, which had been published now at that point for two years. Isn't there evidence of that, you say independent board, isn't there evidence that the board may well have thought that it had little choice but to approve it? There was some evidence that a couple of the union board members felt cautious. I think Mr. Parchment, who was a board member, said he... What do you mean cautious? The government says intimidated. I don't think there was any evidence of that. That's their characterization. Didn't Solander testify that if you vote against it, you lose your effing job? That's what he attributed to the debaucher. Those are frightened words. Those are frightened words, right. And independent of that, the trustees unanimously, the management trustees, whose jobs were not subject to this, voted to reaffirm the program, to go forward, and to pay the funds. And what it brings us back to full circle is the question about double dipping. The government has a burden. On this standard, obviously, the court has to take a hard independent look, as did the trial court, without weighing evidence, without balancing, without making credibility determinations, as to whether there is substantial evidence of fraudulent intent beyond a reasonable doubt. Page 18 of the government's reply brief, 14 different citations. Not a single one of those citations explains anything about how the reimbursement expense process worked. Not a single one of those citations stands for the proposition that Ms. Livinati collected a nickel of profit. Most of those citations, in fact, are to people who say, I don't know how it worked. I'm across the street. The trial attorney asked that of a number of union officials. And in a number of those cases, all they cite is someone saying, I don't know how the process worked. The government has simply not adduced and didn't do the work, and I'm not saying the work would have produced anything but vindication for the way in which Ms. Livinati was reimbursed, but they were unable to prove and did not offer evidence for that point. There's a similar point, page 20, note 12 in their reply brief. It goes to this Graybar event, the trade show. I was going to ask, what was that Graybar event? Graybar was a trade show, and as part of her duties as union caterer, as kind of wearing many hats caterer, Ms. Livinati catered that program. It was a two-day event. A thousand people attended. It was a very substantial event. Ms. Livinati, at the end of the program, after accounting for expenses, essentially retained $9,800 more in payments from the Graybar organization than her costs for her supplies. What did she do? She turned around and wrote that check back to the Joint Apprentice and Training Fund. What was the year of that event? That was 2008. It was the very first year. It was the first task she took on. She did that in the first couple of months she was there. The government says in that footnote, that should be disregarded by the court. Our contentions that that was not profit are something that the jury could disregard and this court should disregard, and they say because it was for costs of utilities and rent. Again, if you go to the three record sites that they put in that footnote, not one supports that on record evidence. The first is to a union official who said, I don't know how the process worked. The other two are to the argument by the prosecutor to the court below during the Rule 29 process. There's no evidence from which that comes. It's not grounded in this record, and there are no citations to documents, analysis, or witness testimony. And on that basis, the government doth protest too much. The government is reaching for an aggravating factor for the kind of indicia of fraudulent intent that we see in every case, and although no one issue is determinative, that I think betrays the government's lack of confidence in their proofs. We ask the court to take a very searching look at that record because it's just not there. And under that circumstance, under the totality circumstance, there is insufficient evidence from which a jury could find that Mr. Dressel acted with fraudulent intent in creating a genuine program, a real program, that produced real and substantial results. Thank you for your consideration. Thank you very much. Mr. Romano? Mr. Romano, the Farkas testimony is certainly helpful to you, but why can't it be characterized as the fact that Ms. Limitati was not working on her staff? Wasn't there ambiguity in the cross-examination? I don't think so at all, Your Honor. The cross-examination was, did she work on your staff? No. I mean, that didn't limit what she had said earlier. She provided no services for the union in 2008. And, yes, she didn't work on my staff. But that didn't limit her earlier testimony. The testimony is she didn't perform no service for the union in 2008. And there's no reason to – I mean, I think the defendant kind of wants to re-litigate a leva, which is authorization of benefit. Maybe there was a benefit. We all admit that. What you just conceded, though, that's what the brief said at page 31, but counsel, I thought, aptly conceded that there weren't a totality of circumstances test. Totality of the circumstances. And I asked the court to look at what the jury saw. Okay. The jury heard that there's this new program out of the blue. And guess what? Not really necessary. Trumped up.  We have testimony, not necessary. What do we hear next? Oh, by the way. It's a different thing when you say not necessary, trumped up. I understand your argument is that we have to interpret the record in the light most favorable to the government and, therefore, not necessarily that the government could conclude or the jury could conclude trumped up. But I think the point I would simply say was the fact that it's not necessary. Even if they concluded that, the record would not substantiate the lead over to trumped up. He came back and made back that you protest too much. Well, it was pitched as they're drinking at lunch. That wasn't the case. Now, yes, there were incidental benefits, including that they got free lunch. But, I mean, you could come up with incidental benefits all the time. That's the whole point of a lead over, which is you shouldn't let union leaders come up with incidental benefits later on. So what we have is a program that wasn't necessary. What does the jury hear next? Oh, it's given to his live-in girlfriend, who's a caterer. The jury could raise eyebrows about that. The district court just disregarded it. Oh, well, nepotism happens all the time. Well, the jury could consider that. A program that wasn't necessary given to the live-in girlfriend. What do we hear next? Oh, it's $8, which the trustees claim total cost. I hear $8. I think it's the total cost. Guess what? Now she has a $1,000 salary with a $500 fringe benefits a week. The jury could consider that. What do we hear next? Judge McKee, you brought it up, or Judge Hartman, either one, that people didn't want to give their opinion. Malazzo said he felt like he had to give, say, yes, this is a problem. Why? Because he wanted to go along with the bosses. This was a done deal. Salader testified he didn't even give his opinion. Why? Because one of the faculty members was told to find another effing job. What about Parchment? He's later fired when he takes a contrary position. So, yes, there was, you know, intimidation here. The trustees went along. And even if they, you know, approved it two years later, again, under a LEVA, that doesn't matter, or that's not a determinative factor. Because, again, we're looking at the union. What would the union have done if they had known? If they had known that this wasn't $8 a day, this was really, I mean, if you work out her salary, it was probably more like $12, $16, $20 a day. Would the union have been happy about that? Would they have approved that expenditure? So the court has to look at the totality of the circumstances. And I just leave you with a statement, with what Coleman says. The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality. And the answer to that is no. Mr. Romano, I have to confess, I was disturbed by this transcript. There was a lot of intemperance flowing back and forth between the court and counsel for the government in particular. I didn't see any flowing from defense counsel. But what's the government's position regarding resentencing if, in fact, you're successful in this appeal? Well, the government hasn't asked that this case go elsewhere. I mean, we didn't ask for that relief. I think that what the transcript shows is that the district court did not like this case and made it very clear on the record. Perhaps the person who was bringing it. Well, and I would say that the trial prosecutor here today has been trying union cases longer than I have, and I do think that the district court stepped in multiple occasions where maybe he shouldn't have and revealed an opinion about the case that maybe wasn't what we're used to seeing. And I think that that is reflected in the opinion, which doesn't really follow the Rule 29 standard and doesn't view the evidence in the light most favorable to the government. Okay, Mr. Romano, thank you very much. Thank you both, Prosecutor O'Rourke. Thank you very much. We'll take that into advisement.